**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| MONIKA ROOTS, M.D., | ) |
| *Plaintiff,* | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| TELADOC HEALTH, INC., | )    Case No. 19-CV-567-wmc |
| *Defendant,* | ) |
| | ) |
| TELADOC HEALTH, INC., | ) |
| | ) |
| *Counterclaim Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| MONIKA ROOTS, M.D. | ) |
| | ) |
| *Counterclaim Defendant.* | ) |
| | ) |

### DEFENDANT AND COUNTERCLAIM-PLAINTIFF TELADOC HEALTH, INC.'S ANSWER AND COUNTERCLAIMS TO PLAINTIFF MONIKA ROOTS' COMPLAINT

Defendant Teladoc Health, Inc. ("Teladoc" or the "Company") hereby answers the Complaint of Monika Roots ("Dr. Roots"). Except as specifically admitted below, Teladoc denies the allegations of the Complaint. To the extent that the opening paragraph or any of the headings of the Complaint require a response, Teladoc denies such allegations.

### NATURE OF THIS ACTION

1.     Teladoc admits that Dr. Roots was formerly employed by the Company. Teladoc denies each and every remaining allegation in Paragraph 1.

2.     To the extent Paragraph 2 states a legal conclusion, no response is required. Teladoc denies each and every allegation in Paragraph 2.

3.      Teladoc denies each and every allegation in Paragraph 3.

4.      To the extent Paragraph 4 states a legal conclusion, no response is required.  To the extent a response is required, Teladoc denies each and every allegation in Paragraph 4.

## PARTIES

5.      The allegations contained in Paragraph 5 are not directed toward Teladoc, and therefore no response is required.  To the extent a response is required, Teladoc lacks knowledge and information sufficient to form a belief as to the truth of each and every allegation in Paragraph 5.

6.      The allegations contained in Paragraph 6 are not directed toward Teladoc, and therefore no response is required.  Teladoc admits that Dr. Roots represented to Teladoc that she is a medical doctor and licensed psychiatrist.  Teladoc lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 6.

7.      Teladoc admits that Dr. Roots was formerly employed by Teladoc as the Vice President of Health Services and Behavioral Health for Teladoc.  Teladoc admits that Dr. Roots previously served as an independent contractor physician for Teladoc Behavioral Health, P.A.  Teladoc denies all remaining allegations contained in Paragraph 7.

8.      Teladoc admits the allegations in Paragraph 8.

9.      Teladoc admits the allegations in Paragraph 9.

## JURISDICTION AND VENUE

10.     Paragraph 10 states a legal conclusion to which no response is required.  To the extent a response is required, Teladoc admits that the Complaint alleges damages in excess of $75,000.  Teladoc denies all remaining allegations contained in Paragraph 10.

11.     To the extent Paragraph 11 states a legal conclusion, no response is required. Teladoc admits that it transacts business in Wisconsin.

12.     To the extent Paragraph 12 states a legal conclusion, no response is required. Teladoc admits that it transacts business in the Western District of Wisconsin.

## FACTUAL BACKGROUND

13.     The allegations contained in Paragraph 13 are not directed toward Teladoc, and therefore no response is required. To the extent a response is required, Teladoc denies the allegations in Paragraph 13.

14.     The allegations contained in Paragraph 14 are not directed toward Teladoc, and therefore no response is required. To the extent a response is required, Teladoc lacks knowledge of information sufficient to form a belief as to the truth of the allegations in Paragraph 14.

15.     The allegations contained in Paragraph 15 are not directed toward Teladoc, and therefore no response is required. To the extent a response is required, Teladoc lacks knowledge of information sufficient to form a belief as to the truth of the allegations in Paragraph 15.

16.     Teladoc admits that Dr. Roots began working for Teladoc. as an independent contractor physician on or around May 27, 2015. Teladoc denies the remaining allegations in Paragraph 16.

17.     Teladoc admits that Exhibit A purports to be a partially executed copy of the Physician Agreement. To the extent Paragraph 17 purports to describe or characterize the Physician Agreement, that documents speaks for itself. Teladoc denies the remaining allegations in Paragraph 17 .

18.     To the extent Paragraph 18 calls for a legal conclusion, no response is required.  To the extent Paragraph 18 purports to describe or characterize the Physician Agreement, that documents speaks for itself.  Teladoc denies the remaining allegations in Paragraph 18.

19.     Teladoc admits that Paragraph 19 purports to describe Dr. Roots' responsibilities under the Physician Agreement, which speaks for itself.  Teladoc denies the remaining allegations in Paragraph 19.

20.     Teladoc admits that Paragraph 20 purports to quote the definition of confidential information under the Physician Agreement, which speaks for itself.  Teladoc denies the remaining allegations in Paragraph 20.

21.     Teladoc admits that Paragraph 21 purports to quote the definition of confidential information under the Physician Agreement, which speaks for itself.  Teladoc denies the remaining allegations in Paragraph 21.

22.     Teladoc admits that Paragraph 22 purports to characterize certain termination provisions of the Physician Agreement, which speaks for itself.  Teladoc denies the remaining allegations in Paragraph 22.

23.     To the extent Paragraph 23 calls for a legal conclusion, no response is required.  To the extent a response is required, Teladoc denies any and all allegations in Paragraph 23, except Teladoc admits that Dr. Roots has provided psychiatric services to patients through the Teladoc platform.

24.     Teladoc admits that the Company acquired CogCubed on or about December 5, 2016.  Teladoc denies the remaining allegations in Paragraph 24.

25.     Teladoc admits that Dr. Roots entered into an employment agreement with the Company on or about December 5, 2016 and that Exhibit B is a true and correct copy of the Employment Agreement.  Teladoc denies the remaining allegations in Paragraph 25.

26.     Teladoc admits that the Company employed Mr. Kurt Roots as Director of Engineering for the Company.  Teladoc lacks knowledge and information sufficient to form a belief as to the truth of additional allegations in Paragraph 26.

27.     Teladoc admits that Paragraph 27 purports to cite the terms for a base salary, bonus eligibility, and common stock purchases under the Employment Agreement and a separate Employee Stock Option Agreement, each of which speaks for itself.  Teladoc further admits that Dr. Roots received stock options pursuant to stock options agreements.  Teladoc denies the remaining allegations in Paragraph 27.

28.     Admitted.

29.     Teladoc denies each and every allegation in Paragraph 29.

30.     Teladoc admits that the Company has established and maintained several Professional Corporations ("PCs") and Professional Associations ("PA") across the country and that Dr. Roots served as owner and/or president of several such PCs and PAs.  Teladoc also admits that Dr. Roots was paid a monthly stipend associated with her roles on these PCs and PAs.  Teladoc denies the remaining allegations in Paragraph 30.

31.     Teladoc denies each and every allegation in Paragraph 31.

32.     Teladoc denies each and every allegation in Paragraph 32.

33.     Teladoc admits that Dr. Roots title and responsibilities at the Company changed over time.  Teladoc denies the remaining allegation in Paragraph 33.

34.     Teladoc admits that baseless lawsuits have been filed against the Company, including *Reiner et al., v. Teladoc Health, Inc. et al.*, Case No. 18-cv-11603 (S.D.N.Y. May 20, 2019) and *Kreutter v. Gorevic, et al.*, Civ. No. 19-cv-05875 (S.D.N.Y. June 21, 2019). Teladoc looks forward to vindicating its rights in each of those lawsuits. Teladoc denies the remaining allegations in Paragraph 34.

35.     Teladoc denies each and every allegation in Paragraph 35, except Teladoc admits that Dr. Roots filed a complaint with the Equal Employment Opportunity Commission on or about March 1, 2018.

36.     Teladoc admits that Dr. Roots and Teladoc entered into the Settlement Agreement on or about June 22, 2018. Teladoc admits that Paragraph 36 purports to describe certain rights under the Settlement Agreement, which speaks for itself. Teladoc denies the remaining allegations in Paragraph 36.

37.     Teladoc admits that Paragraph 37 purports to describe certain rights and obligations under the Settlement Agreement, which speaks for itself.

38.     Teladoc admits Paragraph 38 purports to describe certain representations contained within the Settlement Agreement, which speaks for itself.

39.     Teladoc denies each and every allegation in Paragraph 39.

40.     Teladoc denies each and every allegation in Paragraph 40.

41.     Teladoc admits that the Company's attorney sent a letter by courier to Dr. Roots on April 9, 2019 and that Exhibit E is a true and correct copy of the April 9 Letter. Teladoc denies that this letter made "false allegations" against Dr. Roots. To the contrary, and as set forth in the paragraphs below, Dr. Roots has engaged in an ongoing scheme to divulge the Company's confidential information for her own personal benefit and the benefit of others, in breach of her

contractual duties and applicable law. Teladoc lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 41 relating to who else was present with Dr. Roots at the time she received the letter. Teladoc denies the remaining allegations in Paragraph 41.

42.     Teladoc admits that Paragraph 42 purports to describe the contents of an April 9, 2019 letter, which speaks for itself. Teladoc denies each and every allegation in Paragraph 42.

43.     Teladoc admits that Paragraph 43 purports to describe the contents of an April 9, 2019 letter, which speaks for itself. Teladoc further admits that Dr. Roots' disclosure of confidential information constitutes a breach of several of her duties and obligations to Teladoc. Teladoc denies the remaining allegations in Paragraph 43.

44.     Teladoc admits that Paragraph 44 purports to describes the contents of an April 9, 2019 letter, which speaks for itself. Teladoc further admits that Dr. Roots breached several of her duties and obligations to Teladoc, including but not limited to Section 12 of the Settlement Agreement and Paragraph 9 of the Physician Agreement.

45.     Teladoc admits that the April 9 Letter states in part: "Teladoc Behavior hereby terminates the Physician Agreement for 'cause' pursuant to the terms of Section 4(b) thereof."

46.     Teladoc denies each and every allegation in Paragraph 46, except Teladoc admits the Company placed Mr. Kurt Roots on administrative leave on or about April 9, 2019. The Company informed Mr. Roots that his employment would be terminated, effective June 30, 2019, on or about June 26, 2019.

47.     Teladoc denies each and every allegation in Paragraph 47.

48.     To the extent Paragraph 48 states a legal conclusion, no response is required. Teladoc denies each and every allegation in Paragraph 48.

49.     Teladoc denies each and every allegation in Paragraph 49.

50.     Teladoc admits that as of April 9, 2019, Dr. Roots held ███ Vested Options, and further held options that had not yet vested.  Teladoc lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 50.

51.     Teladoc denies each and every allegation in Paragraph 51.

52.     Teladoc lacks knowledge and information sufficient to form a belief as to the timing of any notifications provided to Dr. Roots.  Teladoc denies the remaining allegations in Paragraph 52.

53.     Teladoc lacks knowledge and information sufficient to form a belief as to the truth of each and every allegation in Paragraph 53.

54.     Teladoc lacks knowledge and information sufficient to form a belief as to the truth of each and every allegation in Paragraph 54, except Teladoc admits ███ Vested Options previously available to Dr. Roots expired.

55.     Teladoc lacks knowledge and information sufficient to form a belief as to the truth of each and every allegation in Paragraph 55.

56.     Teladoc admits that Dr. Roots has requested that Teladoc restore the Vested Options that were seized as a result of Dr. Roots' improper conduct and breach of various agreements.  Teladoc admits that it has not allowed exercise of these Vested Options.

57.     Teladoc denies each and every allegation in Paragraph 57.

58.     Teladoc denies each and every allegation in Paragraph 58.

59.     Teladoc denies each and every allegation in Paragraph 59.

60.     Teladoc lacks knowledge and information sufficient to form a belief as to the truth of the allegations relating to Dr. Roots' treatment of former patients.  Teladoc denies the remaining allegations in Paragraph 60.

61.     Teladoc lacks knowledge and information sufficient to form a belief as to the truth of each and every allegation in Paragraph 61, except Teladoc admits that it has truthfully represented, to the best of its knowledge, that all former patients of Dr. Roots known to the Company to be seeking continuing care and receptive to the Company's offer to provide other healthcare professionals have been transferred to other healthcare professionals.

62.     Teladoc denies each and every allegation in Paragraph 62.  Dr. Roots has refused to cooperate with Teladoc in removing Dr. Roots from these PAs or PCs.

63.     To the extent Dr. Roots attempts to quote from or characterize certain documents or filings, those materials speak for themselves.  Teladoc denies each and every remaining allegation in Paragraph 63.  Dr. Roots has refused to cooperate with Teladoc in removing Dr. Roots from these PAs or PCs.

64.     Teladoc denies each and every allegation in Paragraph 64.

65.     Teladoc denies each and every allegation in Paragraph 65.

66.     Teladoc admits that it placed Mr. Roots on paid administrative leave on or about April 9, 2019.

67.     Teladoc denies each and every allegation in Paragraph 67.

68.     Teladoc denies each and every allegation in Paragraph 68.

69.     Teladoc denies each and every allegation in Paragraph 69.

## FIRST CAUSE OF ACTION
### (Purporting to Allege Breach of the Options Agreement)

70.     Teladoc re-alleges and incorporates the responses set forth in the preceding paragraphs as if fully set forth herein.

71.     Teladoc admits that as of April 9, 2019, Dr. Roots had ███ Vested Options.

72.     To the extent Paragraph 72 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 72, except Teladoc admits that the Options Agreements, the Employment Agreement, the Physician Agreement, the Confidentiality Agreement and the Settlement Agreement each contain terms and conditions that ultimately govern rights to and in the Vested Options.

73.     Teladoc denies each and every allegation in Paragraph 73, except that Teladoc admits that ███ Vested Options expired prior to May 3, 2019.

74.     Paragraph 74 states a legal conclusion to which no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 74.

75.     Paragraph 75 states a legal conclusion to which no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 75.

76.     To the extent Paragraph 76 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 76, except Teladoc admits that the Options Agreements, the Employment Agreement, the Physician Agreement, the Confidentiality Agreement and the Settlement Agreement each contain terms and conditions that ultimately govern rights to and in the Unvested Options.

## SECOND CAUSE OF ACTION
### (Purporting to Allege Breach of Settlement Agreement)

77.     Teladoc re-alleges and incorporates the responses set forth in the preceding paragraphs as if fully set forth herein.

78.     Admitted.

79.     Teladoc denies each and every allegation in Paragraph 79.

80.     To the extent Paragraph 80 states a legal conclusion, no response is required.  To the extent a response is required, Teladoc denies any factual allegations in Paragraph 80.

81.     Teladoc admits that Paragraph 81 purports to characterize or quote the Settlement Agreement, which speaks for itself.  Teladoc denies any remaining allegations in Paragraph 81.

82.     To the extent Paragraph 82 states a legal conclusion, no response is required.  Teladoc denies each and every remaining allegation in Paragraph 82.

83.     To the extent Paragraph 83 states a legal conclusion, no response is required.  Teladoc denies each and every allegation in Paragraph 83.

## THIRD CAUSE OF ACTION
### (Purporting to Allege Breach of Good Faith and Fair Dealing – Settlement Agreement)

84.     Teladoc re-alleges and incorporates the responses set forth in the preceding paragraphs as if fully set forth herein.

85.     Teladoc admits that Paragraph 85 purports to summarize rights and obligations under the Settlement Agreement.  That document speaks for itself.  Teladoc denies each and every remaining allegation in Paragraph 85.

86.     Paragraph 86 states a legal conclusion to which no response is required.  To the extent a response is required, Teladoc denies any factual allegations in Paragraph 86.

87. Paragraph 87 states a legal conclusion to which no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 87.

88. Paragraph 88 states a legal conclusion to which no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 88.

89. To the extent Paragraph 89 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 89.

## FOURTH CAUSE OF ACTION
### (Purporting to Allege Conversion)

90. Teladoc re-alleges and incorporates the responses set forth in the preceding paragraphs as if fully set forth herein.

91. Teladoc denies each and every allegation in Paragraph 91.

92. Paragraph 92 states a legal conclusion to which no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 92.

93. Paragraph 93 states a legal conclusion to which no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 93.

94. To the extent Paragraph 94 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 94.

## FIFTH CAUSE OF ACTION
### (Purporting to Allege Tortious and Intentional Interference with a Physician-Patient Relationship)

95. Teladoc re-alleges and incorporates the responses set forth in the preceding paragraphs as if fully set forth herein.

96. Paragraph 96 states a legal conclusion to which no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 96.

97. To the extent Paragraph 97 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 97, except that Teladoc admits that Dr. Roots provided medical treatment to numerous patients.

98. Teladoc lacks knowledge and information sufficient to form a belief as to the truth of each and every allegation in Paragraph 98.

99. Teladoc lacks each and every allegation in Paragraph 99, except Teladoc admits it is not permitted by policy to share its medical files with Dr. Roots.

100. Teladoc lacks knowledge and information sufficient to form a belief as to the truth of each and every allegation in Paragraph 100.

101. Teladoc denies each and every allegation in Paragraph 101.

102. Teladoc admits that it has truthfully represented, to the best of its knowledge, that all former patients of Dr. Roots known to the Company to be seeking continuing care and receptive to the Company's offer to provide other healthcare professionals have been transferred to other healthcare professionals. Teladoc denies the remaining allegations in Paragraph 102.

103. Teladoc denies each and every allegation in Paragraph 103.

104. To the extent Paragraph 104 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 104.

105. The allegations contained in Paragraph 105 are not directed toward Teladoc, and further state legal conclusions to which no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 105.

## SIXTH CAUSE OF ACTION
### (Purporting to Allege Breach of Oral Contract to Dissolve PAs/PCs)

106. Teladoc re-alleges and incorporates the responses set forth in the preceding paragraphs as if fully set forth herein.

107. The allegations in Paragraph 107 state a legal conclusion, and therefore no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 107.

108. To the extent Paragraph 108 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 108.

109. To the extent Paragraph 109 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 109.

110. The allegations in Paragraph 110 state a legal conclusion, and therefore no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 110.

111. To the extent Paragraph 111 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 111.

112. Teladoc denies each and every allegation in Paragraph 112, except that Teladoc lacks knowledge and information sufficient to form a belief as to Dr. Roots' compliance with medical licensing regulations.

113. Teladoc denies each and every allegation in Paragraph 113.

114. Teladoc denies each and every allegation in Paragraph 114.

115. Teladoc denies each and every allegation in Paragraph 115.

116. Teladoc admits that Dr. Roots is listed as the President of Teladoc Behavioral Health Arizona P.C., Teladoc Behavioral Health Louisiana P.C., Teladoc Behavioral Health Nebraska, P.C., Teladoc Behavioral Health Oklahoma, P.A. and Teladoc Behavioral Health Rhode Island, P.C. Teladoc has requested Dr. Roots complete certain forms and provide certain records

in order to dissolve these businesses; however, Dr. Roots has refused to cooperate. Teladoc denies the remaining allegation in Paragraph 116.

117. The allegations contained in Paragraph 117 are not directed toward Teladoc, and further state legal conclusions to which no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 117.

**SEVENTH CAUSE OF ACTION**
**(Purporting to Allege Promissory Estoppel – Breach of Enforceable Promise to Dissolve PAs/PCs)**

118. Teladoc re-alleges and incorporates the responses set forth in the preceding paragraphs as if fully set forth herein.

119. The allegations in Paragraph 119 state a legal conclusion, and therefore no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 119.

120. Teladoc denies each and every allegation in Paragraph 120, except Teladoc admits that Dr. Roots served as President or Director of certain PAs and PCs.

121. To the extent Paragraph 121 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 121, except Teladoc lacks knowledge and information sufficient to form a belief as to Dr. Roots' actions taken to dissolve the PAs and PCs.

122. Teladoc denies each and every allegation in Paragraph 122.

123. To the extent Paragraph 123 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies any factual allegations in Paragraph 123.

124. To the extent Paragraph 124 states a legal conclusion, no response is required. To the extent a response is required, Teladoc denies each and every allegation in Paragraph 124,

except Teladoc denies knowledge and information sufficient to form a belief as to Dr. Roots' compliance with medical licensing regulations.

125.     Teladoc denies each and every allegation in Paragraph 125.

126.     To the extent Paragraph 126 states a legal conclusion, no response is required.  To the extent a response is required, Teladoc denies each and every allegation in Paragraph 126.

127.     The allegations contained in Paragraph 127 are not directed toward Teladoc, and further state legal conclusions to which no response is required.  To the extent a response is required, Teladoc denies any factual allegations in Paragraph 127.

## <u>TELADOC HEALTH AFFIRMATIVE DEFENSES</u>

128.     Teladoc sets forth below its affirmative defenses.  By setting forth these affirmative defenses, Teladoc does not assume the burden of proving any fact, issue or element of a cause of action where such burden properly belongs to Dr. Roots.  Teladoc reserves the right to amend or add additional affirmative defenses as necessary.

### FIRST AFFIRMATIVE DEFENSE

Dr. Roots' Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Dr. Roots' Complaint is barred, in whole or in part, by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

Dr. Roots' Complaint is barred, in whole or in part, by the doctrine of unclean hands or estoppel.

### FOURTH AFFIRMATIVE DEFENSE

Dr. Roots' Complaint is barred, in whole or in part, because Teladoc's conduct was lawful in all respects under the state and federal laws then applicable.

## FIFTH AFFIRMATIVE DEFENSE

Dr. Roots' Complaint is barred, in whole or in part, because Teladoc's conduct was proper under the relevant agreements in place with Dr. Roots, and/or because Dr. Roots breached her obligations under one or more applicable agreements.

## SIXTH AFFIRMATIVE DEFENSE

Dr. Roots' Complaint is barred to the extent it seeks specific performance because any injury articulated would be compensable by damages.

## SEVENTH AFFIRMATIVE DEFENSE

Dr. Roots' Complaint is barred because, to the extent that she suffered any injury, such injury was not the fault of Teladoc.

## EIGHTH AFFIRMATIVE DEFENSE

Dr. Roots' Complaint is barred because she was engaged in illegal conduct.

## NINTH AFFIRMATIVE DEFENSE

Dr. Roots' Complaint is barred, in whole or in part, by the merger clauses under the relevant agreements and the parol evidence rule.

## TENTH AFFIRMATIVE DEFENSE

Dr. Roots' Complaint is barred because Dr. Roots has failed to allege cognizable damages.

## TELADOC HEALTH, INC.'S COUNTERCLAIMS
## AGAINST PLAINTIFF DR. MONIKA ROOTS

Teladoc, by and through its undersigned attorneys, Boardman & Clark LLP and Latham & Watkins LLP, asserts the following counterclaims against Dr. Roots for her various breaches of contract, breaches of fiduciary duties, tortious interference, and other corporate malfeasance, and hereby states as follows:

## NATURE OF THE ACTION

1.      Teladoc brings this lawsuit against Dr. Monika Roots seeking damages for Dr. Roots' tortious and malicious conduct, including the financial harm to the Company's goodwill caused by Dr. Roots' ongoing disparagement of the Company and dissemination of the Company's confidential information.  Such conduct violates several of Dr. Roots' employment contracts, as well as her fiduciary duties, state and federal trade secret laws, and federal securities laws.

2.      Dr. Roots joined Teladoc in or around 2015 as an independent contractor, and eventually became Vice President of Health Services for the Company.  In that role, Dr. Roots was charged with overseeing patient care for over 200,000 of Teladoc's patients.  Over her three years with the Company, Teladoc entrusted Dr. Roots with helping develop key aspects of the Company's telehealth business and expansion.  In her role as Vice President of Health Services, Dr. Roots had access to key information related to, among other things, Teladoc's financials, expansion, strategic acquisitions, technology, and patient services.  Upon joining Teladoc and at all times thereafter, ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

3.      Instead, shortly after leaving Teladoc in 2018, and unbeknownst to Teladoc, Dr. Roots began to market Teladoc's confidential information to third parties, including Teladoc competitors and certain hedge fund research networks, among others, for the purpose of helping them gain an unfair business or trading advantage.   In addition, Dr. Roots began disparaging Teladoc to institutions, including those same hedge fund research networks.   These false and disparaging remarks were often then being published with the intent to induce fluctuations in Teladoc's share price.   Dr. Roots misappropriated Teladoc's confidential information from the time she left Teladoc up to and including when Teladoc discovered her scheme in or about April 2019.

4.      Dr. Roots owes fiduciary and contractual duties to the Company to protect Teladoc's confidential information and refrain from disparaging the Company.   Dr. Roots has breached these duties.   Dr. Roots has also conspired with others to violate state and federal trade secrets and securities laws.

5.      Dr. Roots' conduct has caused immeasurable damage to Teladoc's goodwill, and must be stopped.   Teladoc now brings these counterclaims against Dr. Roots for breach of contract (Counts I, II, and III), breach of fiduciary duty (Count IV), misappropriation of trade secrets (Counts V and VI), and violation of the federal securities laws (Count VII).

## PARTIES

6.      Teladoc is a publicly traded telemedicine company registered on the New York Stock Exchange ("NYSE").   Teladoc is a Delaware corporation with its principal place of business in Purchase, New York.

7.      Dr. Roots is a former employee Teladoc, employed and/or contracted with the Company between in or about 2015 and 2018.  On information and belief, Dr. Roots resides in Madison, Wisconsin.

## JURISDICTION & VENUE

8.      The Counterclaims include state and common law claims for breach of fiduciary duty, tortious interference with contractual relations and prospective contractual relations, breach of contract, and trade secret misappropriation**.**  The amount in controversy exceeds $75,000 and this Court thus has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

9.      The Counterclaims also bring claims under federal law, including but not limited to claims brought under the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836 *et seq.*).  This Court, therefore, also has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

10.      This Court also has supplemental jurisdiction over claims insofar as they form part of the case or controversy pursuant to 28 U.S.C. § 1367(a).

11.      This Court has personal jurisdiction over Dr. Roots.  Dr. Roots is a resident of Wisconsin.

## FACTUAL ALLEGATIONS

### A.      Teladoc Values And Protects Its Confidential Information

12.      Teladoc is the largest and oldest telemedicine company in the world.  The Company was launched in 2002 in Dallas, Texas by Dr. Byron Brooks, Dr. Oscar Boultinghouse and Michael Gorton, and offers a "telehealth" platform that allows patients to obtain healthcare consultations through mobile devices, the Internet, video and phone.  Teladoc uses a cutting-edge technology platform and leverages a national provider network to deliver fast and reliable care to its consumers, which include employers and healthcare providers.  Teladoc was incorporated in 2008 as Teladoc, Inc.

13.     In July 2015, Teladoc became the first publicly traded telemedicine company and remains the only public telemedicine company today.  Teladoc has a reputation across the telehealth community for its industry-leading strategy and services.  In 2018, MedTech named Teladoc the Best Telehealth Platform for its innovative solutions that deliver on the promise of virtual care around the globe and move the healthcare industry forward.  Frost & Sullivan named Teladoc the United States "2017 Company of the Year" in telehealth services and recognized the Company's visionary innovation, performance and customer impact.  The MIT Technology Review similarly recognized Teladoc as one of the "50 Smartest Companies" of 2015 in June of that year.

14.     Teladoc has spent considerable resources developing its platforms, client base, physician network, business strategy, and pricing models, all of which are Teladoc's confidential and proprietary information.  Such information is invaluable to both hedge funds looking to inappropriately look to trade on inside information and competitors seeking shortcuts to replicate Teladoc's success and growth in the market.  Teladoc's protection of its confidential information is therefore of utmost importance to the Company, and release of the Company's confidential information could cause immeasurable harm.

15.     Teladoc has accordingly attempted to protect its proprietary and confidential information however possible.  The Company has developed standardized security procedures and safeguards to protect the confidential information of its customers and clients.  The Company has also developed internal policies regarding the sharing and dissemination of confidential information.  In addition, the Company requires that officers, directors, and employees adhere to strict non-disclosure and non-disparagement requirements, as memorialized in the Company's employment agreements.  ██████████████████████████████████████

**B.** **As A Condition Of Her Employment, Dr. Roots Promised That She Would Protect Teladoc's Confidential Information And Not Compete With Teladoc After Leaving The Company**

16.     On or about May 26, 2015, Dr. Roots began work for Teladoc.  Teladoc recruited Dr. Roots to help develop and roll out telemedicine services—specifically, psychology and psychiatry services that could be provided remotely.  Both Teladoc and Dr. Roots understood that through the development of these services, Dr. Roots would necessarily be privy to confidential information, including but not limited to information regarding: (a) the recruitment, hiring, and training of doctors and physicians who would perform these services; (b) the standards for credentialing and certifying these doctors and physicians; (c) development of pricing models related to compensation, expenses, and customer charging; (d) customer and patient demand for services, customer lists, and subscription and utilization volumes; and (e) the strategic growth and future business planning related to these services.

17.     At the outset of Dr. Roots' hiring, Teladoc and Dr. Roots agreed that Teladoc was the sole owner of its confidential information and Dr. Roots could not, under any circumstances, improperly disseminate that information, either while employed by Teladoc, or at any time thereafter.

18.     Dr. Roots signed three agreements with Teladoc or Teladoc affiliates ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

19.     *First*, on or about May 26, 2015, Dr. Roots entered into the Independent Contractor Physician Agreement (the "Physician Agreement").  *See* Plf's. Compl., Ex. A, Dkt. No. 1-3.  ████

██████████████████████████████████████████████████████
██

- ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████

- ████████████████████████████████████████████
  ██████████████████████████

20. ████████████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████

21. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

22.    *Second*, on or about December 5, 2016, Teladoc and Dr. Roots entered into an Employment Agreement governing Dr. Roots' transition to Vice President of Teladoc's Health Services division, ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

23. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

24. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████



25.  *Third,* on or about December 5, 2016, Dr. Roots voluntarily executed an Employee Confidentiality and Proprietary Rights Agreement with Teladoc (the "Confidentiality Agreement").  *See* Plf's. Compl., Ex. B, Dkt. 1-4 at 23.  ████████████████████████



26.    Dr. Roots assumed significant responsibility in her high-level managerial position as Vice President of Health Services at Teladoc.  Teladoc entrusted Dr. Roots with a great deal of authority within the Company, and permitted her access to confidential, proprietary information. Through her roles and responsibilities at the Company, Dr. Roots assumed fiduciary duties— including the duties of care, loyalty and obedience—to the Company and its shareholders.

27.

## C. During Her Tenure At Teladoc, Dr. Roots Amassed Teladoc's Confidential Information

28.     For the nearly four years that Dr. Roots worked for Teladoc and/or its affiliates, one of Dr. Roots' primary responsibilities was to help develop the Company's telebehavioral platform and services, which were designed to offer, among other things, psychiatric and psychological services to patients across the country.   Over that period, Dr. Roots amassed knowledge of Teladoc confidential and proprietary information, including information related to the Company's network of medical professionals, customer lists and pricing models, and future expansion and business planning.

29.     Dr. Roots was intimately involved in all facets of development and rollout of these telebehavioral services from the ground up.   For instance, Dr. Roots gained an extensive knowledge of the medical professionals who were qualified to offer telebehavioral services, the Company's methodology for recruiting, evaluating, and accrediting those medical professionals, compensation and training of those medical professionals, and the roster of professionals offering telebehavioral services through Teladoc.   This information was non-public, developed over the course of several years after substantial effort of Teladoc employees, and would be of significant economic value to Teladoc competitors and hedge funds, alike.

30.     Dr. Roots was also involved in the internal research and development for Teladoc's telebehavioral business, including research and development for the guidelines and safety protocols that Teladoc's medical professionals would follow in prescribing medications through Teladoc's telebehavioral offerings.   This research and work product is non-public, and would require a significant investment in expertise and resources by competitors to independently derive such materials, thus providing Teladoc an economic advantage over its competitors.

31.     In addition, Dr. Roots had unfettered access to all aspects of Teladoc's

telebehavioral business, including the pricing strategy for telebehavioral offerings, compensation figures for telebehavioral medical professionals, productivity and utilization figures and metrics for its telebehevioral services, profit margins, projected profitability and growth for the telebehavioral sector and Teladoc more generally, patient lists, current customer lists, prospective customer lists, and potential strategic acquisitions, among other types of information. This proprietary and confidential information would not only be valuable to competitors seeking an unfair business advantage, but also to hedge fund research networks and other financial institutions seeking to trade on improperly or manipulate Teladoc's share price.

32.     Finally, Dr. Roots gained significant insight into the regulatory challenges and other problem-solving efforts of Teladoc in rolling out its business, the solutions developed to overcome those challenges, and how such challenges were ultimately addressed within the Company.

33.     Teladoc provided Dr. Roots access to this private and confidential information in confidence so that she could fulfill her high-level, managerial role at the Company. Teladoc provided this information with the expectation that Dr. Roots would maintain its confidentiality and secrecy, as evinced by the Confidentiality Agreement and other relevant agreements.

**D.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

34. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

35. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[REDACTED]

36. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

37. [REDACTED]

[REDACTED]

[REDACTED]

**E.    Dr. Roots Joins Sanvello And Begins To Disseminate Teladoc's Confidential Information**

38.    On information and belief, [REDACTED]

[REDACTED]

[REDACTED], Dr. Roots has profited from the information she had amassed through her positions of trust and confidence at Teladoc.

39.    As one example, in or around late 2018 or early 2019, Dr. Roots began disclosing Teladoc's confidential information to, among others, one or more hedge fund research networks seeking insider information on Teladoc.  On information and belief, this information included, but was not limited to, information regarding Teladoc's telebehavioral business, growth, customers, potential acquisitions, strategic challenges, and other facets of the business.

40.    Upon information and belief, Dr. Roots disclosed this information under the pretense of providing "consulting" related to the telehealth market.  However, in reality, as Teladoc is the only publicly traded telemedicine company, hedge fund research networks primarily valued this information because it would help them manipulate Teladoc's stock price and improperly trade

on non-public information. ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████

41.     Upon information and belief, at or around the same time, Dr. Roots began disparaging Teladoc to these and other parties, including by making false and disparaging statements regarding Teladoc's health network processes.   At least some of these false and disparaging statements were later publicly published, causing harm to Teladoc's share price and business operations. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████

42.     Dr. Roots also accepted employment as Chief Medical Officer of Sanvello Health ("Sanvello") in or around January 2019.  Sanvello competes directly with Teladoc in telemedicine and telehealth, and in fact advertises itself as "[t]he #1 app for stress, anxiety, and depression with 2.9 million users."   On information and belief, Dr. Roots provides support for and oversees Sanvello's telebehavioral business, which directly conflicts with her role at Teladoc.   On information and belief, Dr. Roots has provided Sanvello with trade secrets and other confidential, proprietary information including the pricing strategy for telebehavioral offerings, compensation figures for telebehavioral medical professionals, productivity and utilization figures and metrics for its telebehevioral services, profit margins, projected profitability and growth for the telebehavioral sector and Teladoc more generally, patient lists, current customer lists, prospective customer lists, and potential strategic acquisitions, among other types of information. ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

43. Dr. Roots' dissemination of disparaging and defamatory information, confidential, proprietary information and trade secrets along with her solicitation of Teladoc customers and competition with Teladoc materially damaged the goodwill and business of Teladoc, and its continued dissemination is causing irreparable harm to the Company.

44. Dr. Roots' conduct further breaches her fiduciary duties to the Company.

**F.     Dr. Roots Has Refused To Cease And Desist Her Tortious Conduct**

45. Immediately upon learning that Dr. Roots had disclosed confidential, proprietary information and trade secrets and disseminated disparaging information about Teladoc, the Company notified Dr. Roots that she was in breach of the Settlement Agreement, the Physician Agreement, the Employment Agreement, and the Confidentiality Agreement. *See* Plf's Compl. Ex. E, Dkt. No. 1-7.

46. Teladoc further notified Dr. Roots that it was terminating the Physician Agreement for cause. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

47. Following her resignation, Teladoc offered to transition all former patients of Dr. Roots to alternative providers in accordance with applicable laws, rules and regulations. All patients who responded to the Company's offer were provided with an alternate doctor in the Teladoc network. On information and belief, Dr. Roots has provided patients with her personal contact information, or those patients have researched Dr. Roots' own contact information online, which has resulted in her receiving messages from former patients.

48. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ on information and belief, Dr. Roots has continued to disparage the

Company and disseminate defamatory and confidential information, including related to its network processing.

## COUNT I
**(Breach of Contract – Employment Agreement)**

49.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

50.      On or about December 6, 2016, Teladoc and Dr. Roots entered into the valid and enforceable Employment Agreement.

51.     ████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████

52.     ████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████

53.     In or around January 2018, Dr. Roots accepted employment with Sanvello as Chief Medical Officer.  Sanvello competes directly with Teladoc in the virtual telehealth industry and even advertises itself as "[t]he #1 app for stress, anxiety, and depression with 2.9 million users." On information and belief, Dr. Roots provides support for and oversees Sanvello's telebehavioral business, which directly conflicts with her former position at Teladoc.  ████████████████████

54. From January through April 2018, while employed at Sanvello, on information and belief, Dr. Roots attempted to or did solicit Teladoc customers on behalf of Sanvello. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

55. In or around late 2018 or early 2019, Dr. Roots began marketing herself as a consultant to hedge fund research networks and others seeking insider information on Teladoc. During this time, Dr. Roots began disparaging Teladoc to these and other parties, including by making false and disparaging statements regarding Teladoc's telehealth network processes. At least some of these false and disparaging statements were later publicly published, causing harm to Teladoc's share price and business operations. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

56. ████████████████████████████████████████

████████ Teladoc has been and will continue to be irreparably harmed.

57. Dr. Roots' actions are the direct and proximate cause of Teladoc's damages.

58. Teladoc is entitled to injunctive relief and damages in an amount to be determined at trial.

<u>**COUNT II**</u>
**(Breach of Contract – Confidentiality Agreement)**

59.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

60.     On December 6, 2016, Teladoc and Dr. Roots entered into the valid and enforceable Confidentiality Agreement.

61.     █████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████

62.     █████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████

63.     In or around late 2018 or early 2019, Dr. Roots began marketing herself as a consultant or otherwise to one or more hedge fund research networks seeking insider information on Teladoc.   In the course of her consultation, Dr. Roots provided  material, confidential information of Teladoc to the Company's to private financial institutions seeking to use Teladoc's confidential information to their improper advantage.

64.     On information and belief, Dr. Roots provided material, confidential information to hedge fund research networks and financial institutions in exchange for financial payments.  On information and belief, this information included, but was not limited to, information regarding Teladoc's telebehavioral business, growth, customers, potential acquisitions, strategic challenges,

33

and other facets of the business. █████████████████████████████████

████████████████████████████████████████████████████████████

████████

65.     In the process of providing hedge fund research networks with material, confidential information, Dr. Roots also provided these hedge fund research networks and competitors with Teladoc work product. ████████████████████████████████

████████████████████████████████████████████████████████████

████████

66.     ██████████████████████████████████████████████████████

██████████████████ Teladoc has been and will continue to be irreparably harmed.

67.     Dr. Roots' actions are the direct and proximate cause of Teladoc's damages.

68.     Teladoc is entitled to injunctive relief and damages to be determined at trial.

## <u>COUNT III</u>
### (Breach of Contract – Settlement Agreement)

69.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

70.     ██████████████████████████████████████████████████████

████████████████████

71.     ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████

72. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

73. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

74. ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

75. ████████████████████████████████████

█████████████████████████████████

76.     Dr. Roots' actions are the direct and proximate cause of Teladoc's damages.

77.     Teladoc is entitled to injunctive relief and damages. ██████████████

████████████████████████████████████████

## COUNT IV
### (Breach of Fiduciary Duty)

78.    The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

79.    Dr. Roots assumed significant responsibility in her high-level managerial position as Vice President of Health Services at Teladoc.  Teladoc entrusted Dr. Roots with a great deal of authority and trust within the Company, and permitted her access to confidential, proprietary information.  Through her roles and responsibilities at the Company, Dr. Roots assumed fiduciary duties, including the duties of care, loyalty and obedience—to the Company and its shareholders.

80.    Dr. Roots used her position as a Teladoc executive to benefit her own personal interests at the Company's expense.  Dr. Roots' actions in breach of her fiduciary duty include but are not limited to, taking Teladoc's business opportunities, as well as its trade secret, proprietary and confidential information.  This information included, but was not limited to, information regarding Teladoc's telebehavioral business, growth, customers, potential acquisitions, strategic challenges, and other facets of the business such as customer lists, potential investors, business strategies and other facets of the business.

81.    On information and belief, Dr. Roots provided this information to competitors— such as Sanvello—and hedge fund research networks and others that could trade on the insider information.  Dr. Roots originally learned of this information only through her role and position of trust at Teladoc and has used that information to her advantage and Teladoc's detriment.

82.    Dr. Roots' unlawful conduct has injured Teladoc's business and will continue to harm Teladoc's business until her efforts are curtailed.

83.    Dr. Roots' actions are the direct and proximate cause of the harm to Teladoc's business.

84. Teladoc is entitled to injunctive relief and damages to be determined at trial.

## COUNT V
**(Misappropriation of Trade Secrets (WIS. STAT. ANN. § 134.90))**

85. The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

86. Teladoc is the owner of trade secrets that Dr. Roots misappropriated. These trade secrets relate to, among other things, the Company's customer information (including customer lists, prospective customers, utilization rates, and other financial information), recruitment processes (including physician lists and qualifications), credentialing processes, pricing models, potential acquisitions, research and development work product related to standards and practices, and mobile prescription processes.

87. Teladoc took reasonable measures to protect and maintain the secrecy of its trade secrets and confidential and proprietary information, including but not limited to, having its employees and any entities or individuals that performed work on its behalf sign confidentiality and non-disclosure agreements prohibiting the disclosure of confidential, proprietary information, and limiting access to its offices, computers and other data storage facilities.

88. Teladoc has expended significant resources to develop its trade secrets and other confidential, proprietary information, to offer innovative access to medical care as the largest, oldest and only publicly traded telemedicine company in the world. For example, Teladoc uses a cutting-edge technology platform and leverages a national provider network to deliver fast and reliable care to its consumers, which include employers and healthcare providers. Teladoc's trade secrets and confidential proprietary information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the

37

information.  These Teladoc trade secrets are highly valuable to Teladoc and to any other person or entity that wants to enter the field of telemedicine.

89.    Dr. Roots knew that she acquired trade secrets from Teladoc under circumstances giving rise to ██████████████████ fiduciary duties ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████

90.    On information and belief, ████████████████████████████████ Dr. Roots knowingly disclosed the trade secrets to others, including hedge fund research networks and competitors.

91.    As just one example, on information and belief, in or around late 2018 or early 2019, Dr. Roots began disclosing Teladoc's trade secrets to, among others, one or more hedge fund research networks seeking insider information on Teladoc.  This information included, but was not limited to, information regarding Teladoc's telebehavioral business, growth, customers, potential acquisitions, strategic challenges, and other facets of the business.  Dr. Roots disclosed this information under the pretense of providing "consulting" services; however, in reality, as Teladoc is the only publicly traded telemedicine company, hedge fund research networks primarily valued this inside information because it would help them improperly manipulate Teladoc's stock price and facilitate trading of Teladoc shares.

92.    As another example, Dr. Roots accepted employment as Chief Medical Officer of Sanvello in or around January 2019.  On information and belief, Dr. Roots provides support for and oversees Sanvello's telebehavioral business, which directly conflicts with her role at Teladoc.

On information and belief, Dr. Roots has provided Sanvello with trade secrets and other confidential, proprietary information including the pricing strategy for telebehavioral offerings, compensation figures for telebehavioral medical professionals, productivity and utilization figures and metrics for its telebeheviorial services, profit margins, projected profitability and growth for the telebehavioral sector and Teladoc more generally, patient lists, current customer lists, prospective customer lists, and potential strategic acquisitions, among other types of information.

93.     As a direct and proximate result of Dr. Roots' misappropriation of trade secrets and other confidential and proprietary information, Teladoc has suffered and will continue to suffer irreparable harm and other damages, including, but not limited to, the loss of value of its trade secrets.  Teladoc is therefore entitled to injunctive relief, monetary damages for its actual losses, and monetary damages for unjust enrichment where damages for its actual losses are not adequately addressed.

### COUNT VI
**(Violation of the Defend Trade Secrets Act of 2016 (18.  U.S.C. § 1836))**

94.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

95.     Teladoc is the owner of trade secrets that Dr. Roots misappropriated.  These trade secrets relate to, among other things, the Company's customer information (including customer lists, prospective customers, utilization rates, and other financial information), recruitment processes (including physician lists and qualifications), credentialing processes, pricing models, potential acquisitions, research and development work product related to standards and practices, and mobile prescription processes.

96.     Teladoc took reasonable measures to protect and maintain the secrecy of its trade secrets and confidential and proprietary information, including but not limited to, having its

employees and any entities or individuals that performed work on its behalf sign confidentiality and non-disclosure agreements prohibiting the disclosure of confidential, proprietary information, and limiting access to its offices, computers and other data storage facilities.

97. Teladoc has expended significant resources to develop its trade secrets and other confidential, proprietary information, to offer innovative access to medical care as the largest, oldest and only publicly traded telemedicine company in the world. For example, Teladoc uses a cutting-edge technology platform and leverages a national provider network to deliver fast and reliable care to its consumers, which include employers and healthcare providers. Teladoc's trade secrets and confidential proprietary information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. These Teladoc trade secrets are highly valuable to Teladoc and to any other person or entity that wants to enter the field of telemedicine.

98. Dr. Roots knew that she acquired trade secrets from Teladoc under circumstances giving rise to ▮▮▮▮▮▮▮▮▮▮ and fiduciary duties ▮▮▮▮▮▮▮▮▮▮



99. On information and belief, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dr. Roots knowingly disclosed the trade secrets to hedge fund research networks, competitors, and others.

100.    As just one example, on information and belief, in or around late 2018 or early 2019, Dr. Roots began disclosing Teladoc's trade secrets to, among others, one or more hedge fund research networks seeking insider information on Teladoc.  This information included, but was not limited to, information regarding Teladoc's telebehavioral business, growth, customers, potential acquisitions, strategic challenges, and other facets of the business.  Dr. Roots disclosed this information under the pretense of providing "consulting" services; however, in reality, as Teladoc is the only publicly traded telemedicine company, hedge fund research networks primarily valued this inside information because it would improperly help them manipulate Teladoc's stock price and facilitate trading of Teladoc shares.

101.    As another example, Dr. Roots accepted employment as Chief Medical Officer of Sanvello in or around January 2019.  On information and belief, Dr. Roots provides support for and oversees Sanvello's telebehavioral business, which directly conflicts with her role at Teladoc.  On information and belief, Dr. Roots has provided Sanvello with trade secrets and other confidential, proprietary information including the pricing strategy for telebehavioral offerings, compensation figures for telebehavioral medical professionals, productivity and utilization figures and metrics for its telebehevioral services, profit margins, projected profitability and growth for the telebehavioral sector and Teladoc more generally, patient lists, current customer lists, prospective customer lists, and potential strategic acquisitions, among other types of information.

102.    As a direct and proximate result of Dr. Roots' misappropriation of trade secrets and other confidential and proprietary information, Teladoc has suffered and will continue to suffer irreparable harm and other damages, including, but not limited to, the loss of value of its trade secrets.  Teladoc is therefore entitled to injunctive relief, monetary damages for its actual losses,

and monetary damages for unjust enrichment where damages for its actual losses are not adequately addressed.

**COUNT VII**

**(Insider Trading – Violations of 10(b) of the Exchange Act and Rule 10b-5)**

103.    The allegations in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

104.    On information and belief, Dr. Roots, a former employee of Teladoc who had entered into confidential relationships in the conduct of Teladoc's business and who owed a fiduciary duty to Teladoc and its shareholders as a former high-level manager involved in strategic planning, provided material non-public information about Teladoc to hedge fund research network(s)—"Network ABC" (the name of the specific network or networks to be determined during discovery) and other financial institutions and/or hedge fund(s)—"Company ABC" (the name of the specific financial institutions and/or hedge fund(s) to be determined during discovery). Network ABC and/or Company ABC knew that Dr. Roots, in providing confidential information about Teladoc, was breaching that fiduciary duty.

105.    Under these circumstances, Dr. Roots had a duty to refrain from providing the material, confidential information to Network ABC and/or Company ABC in exchange for a financial benefit.  Dr. Roots' duties ran to Teladoc and all shareholders of the Company that sold Teladoc stock during the period in which Network ABC and/or Company ABC purchased Teladoc stock.

106.    Dr. Roots violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that, as alleged above, in connection with the purchase and sale of Teladoc stock she: (a) employed devices, schemes, and artifices to defraud; (b) omitted material facts that she

was under a duty to disclose; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the sellers of Teladoc common stock.

107. Dr. Roots violated 10(b) of the Exchange Act and Rule 10b-5 as a "tipper." Upon information and belief, she disclosed material non-public information regarding Teladoc. The "tippees"—Network ABC and/or Company ABC—then purchased or caused others to purchase stock while in possession of materials non-public information provided by Dr. Roots.

108. Upon information and belief, Dr. Roots violated a relationship of trust with Teladoc by relaying the information and benefitted from the disclosures to Network ABC and/or Company ABC through the compensation that Dr. Roots received as a paid consultant for Network ABC and/or Company ABC. Specifically, in or around late 2018 or early 2019, Dr. Roots began disclosing Teladoc's confidential information to Network ABC and/or Company ABC seeking insider information on Teladoc. On information and belief, this information included, but was not limited to, information regarding Teladoc's telebehavioral business, growth, customers, potential acquisitions, strategic challenges, and other facets of the business. Dr. Roots disclosed this information under the guise of "consulting" information related to the telehealth market generally; however, as Teladoc is the only publicly traded telemedicine company, Network ABC and/or Company ABC primarily valued this information because it would help them manipulate Teladoc's stock price, trade Teladoc's stock, or assist others in trading Teladoc stock.

109. Dr. Roots had actual knowledge that the material positive non-public information about Teladoc had been obtained improperly, unlawfully and in violation of Dr. Roots' fiduciary and contractual duties to Teladoc. She knew that the material non-public information about Teladoc which she possessed and which the public marketplace did not possess would, if publicly known, have altered the market price of Teladoc stock. Nevertheless, Dr. Roots provided the

information for the purpose of Network ABC and/or Company ABC purchasing Teladoc stock without first disclosing the material non-public information about Teladoc.

110.    Had the marketplace and shareholders known of the material non-public information about Teladoc, they would have not sold Teladoc stock or, if they had sold their Teladoc stock, they would not have done so at the artificial prices at which they did.

111.    As a result of the violation of Section 10(b) of the Exchange Act and Rule l0b-5, shareholders sold Teladoc stock at prices which were artificially deflated by reason of Dr. Roots' disclosure of the non-public information about Teladoc, and suffered damages.  In ignorance of the fact that the market price of Teladoc's common stock was artificially altered, and relying upon the integrity of the market in which such shares trade, and/or on the absence of material adverse information that was known by Dr. Roots but not disclosed, shareholders sold Teladoc stock at artificial prices.

112.    Company ABC and Network ABC (among others) will be determined during discovery.  Each of these entities or individuals profited off the sale of the insider information that Dr. Roots provided. The Company alleges damages are in an amount equal to the profits gained by those institutions or individuals.

113.    By reason of the foregoing, Dr. Roots has violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## PRAYER FOR RELIEF

**WHEREFORE,** Teladoc respectfully requests that this Court enter judgment in its favor and against Dr. Monika Roots as follows:

a. A declaration in favor of Teladoc and against Dr. Roots on each Counterclaim contained herein and a final judgment incorporating the same;

b. Issue the following preliminary and permanent orders:

    i. Order Dr. Roots to cease the dissemination of all Teladoc non-public confidential material.

    ii. Order Dr. Roots to cease disparaging Teladoc and enjoin Dr. Roots from publication or dissemination of any further falsehoods or defamatory statements against Teladoc.

    iii. Declare any formerly acquired Vested or non-Vested Options by Dr. Roots expired pursuant to the terms of the Employment Agreement, Confidentiality Agreement, Physician Agreement and ▮▮▮▮▮ ▮▮▮▮▮

c. An award of actual damages to Teladoc in an amount to be proven at trial;

d. An award of restitution and disgorgement of all ill-begotten profits;

e. An award of punitive damages to Teladoc;

f. The costs and expenses of the suit incurred herein, including reasonable attorneys' fees;

g. Seizure of property ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

h.  Such other and further relief as the Court deems just and appropriate under the circumstances.

Dated:  August 23, 2019
          Chicago, Illinois                   Respectfully submitted,

/s/ Matthew W. Walch
Matthew W. Walch
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700
Matthew.Walch@lw.com

Christopher J. Clark (*pro hac vice* forthcoming)
Matthew S. Salerno (*pro hac vice* forthcoming)
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
Tel: (212) 906-1200
Christopher.Clark@lw.com
Matthew.Salerno@lw.com

Barry J. Blonien
Sarah A. Zysltra
BOARDMAN & CLARK LLP
1 S. Pinckney Street, Suite 410 Floor
Madison, WI 53701-0927
Tel:  (608) 257-9521
bblonien@boardmanclark.com
azysltra@boardmanclark.com

*Attorneys for Teladoc Health, Inc.*